**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

DIANE SCARNAVACK,             )
on behalf of Plaintiff and the     )
class members described herein,  )
                            )
             Plaintiff,    )
                            )
     vs.                   )
                            )
PHOENIX LAW PC;         )
WILLIAM TAYLOR ("TY") CARSS; )
TOUZI CAPITAL, LLC;      )
ENG TAING;              )
JOHN DOES 1-10;         )
                            )
             Defendants.  )

**COMPLAINT – CLASS ACTION**

      1.      Plaintiff Diane Scarnavack brings this action to secure redress against illegal conduct by a credit repair organization and the persons responsible for its operation.

**JURISDICTION AND VENUE**

      2.      This Court has jurisdiction under 15 U.S.C. §1679 and 28 U.S.C. §§1331, 1337 and 1367.  On information and belief, the Court also has jurisdiction under 28 U.S.C. §1332(d), the amount in controversy exceeding $5 million on a classwide basis, there being more than 100 class members, and the parties being of diverse citizenship.

      3.      This Court has personal jurisdiction over Defendants because Defendants solicited business from residents of Illinois, and collected money from residents of Illinois under contracts that are void pursuant to the CROA.

      4.      Venue in this District is proper because a material portion of the events at issue occurred here.

      5.      Article III is satisfied because Plaintiff and each class member is entitled to void a contract providing for the payment of money to Defendants, or recover money back from Defendants, or both.

**PARTIES**

6.     Plaintiff Diane Scarnavack is a resident and domiciliary of Chicago, Illinois.

7.     Plaintiff is a "consumer" as defined by 15 U.S.C. § 1679a(1).

8.     Defendant Phoenix Law PC is a corporation organized under California law with offices at 6080 Center Drive, 6th Floor, Los Angeles, CA 90045 and 3347 Michelson Drive, Suite 400, Irvine, CA 92612.  It also uses the address of P.O. Box 749, Millville, NJ 08332.  It was incorporated on January 10, 2023.

9.     Defendant William Taylor ("Ty") Carss ("Carss") is the managing attorney of Phoenix Law PC.  He is also Chief Executive Officer, Chief Financial Officer, and Secretary.  On information and belief, he is also its owner.

10.     Defendant Touzi Capital, LLC, is a limited liability company organized under California law with offices at 340 S. Lemon Ave #8284, Walnut, CA 91789.

11.     Defendant Eng Taing is the Chief Executive Officer and managing member of Touzi Capital, LLC. On information and belief, he is also its owner.

12.     Defendants John Does 1-10 are other persons and entities involved in the operation and financing of Phoenix Law PC, not including The Litigation Practice Group PC ("LPG").

**NON-DEFENDANT LITIGATION PRACTICE GROUP**

13.     LPG was a California corporation with its principal offices at 17542 East 17th Street, Suite 100, Tustin, CA 92780.  It is now bankrupt.

14.     The principal individual who ran LPG was Tony Diab ("Diab"), who was an attorney in California and Nevada until he was disbarred in 2019-2020 for conversion of client funds and forgery.

15.     To conceal the fact that Diab ran LPG, a licensed California attorney, Daniel March ("March"), purportedly was the sole officer of LPG.  In fact, Diab had control over LPG's finances, trust account, operations, and activities with respect to consumers, including the supervision of non-attorney staff who send letters to credit bureaus and creditors on behalf of consumers. On

information and belief, March authorized Diab to use his name in connection with LPG operations as Diab saw fit, including signing March's signature on contracts and communicating with third parties on behalf of LPG. Diab used the name "Admin" and the email address "admin@lpglaw.com" when acting on behalf of LPG, to hide his involvement. March received a six-figure salary in exchange for the use of his name.

16. On information and belief, at all times relevant to this Complaint, LPG and Phoenix Law, Eng Taing, and Touzi Capital, LLC, were co-conspirators, agents, servants, employees, alter egos, successors-in-interest, subsidiaries, affiliated companies, and joint ventures of each other, and were acting within the course, scope, and authority of each other. Further, on information and belief, LPG and each of the named Defendants acted in concert with, and with the consent of, each other, and each of them ratified or agreed to accept benefits of the conduct of each other.

## CREDIT REPAIR BUSINESS OF LPG

17. LPG was a credit repair organization that offered its clients services designed to improve their credit history, including working towards actively settling debts for such consumers.

18. LPG employed "Marketing Affiliates" to sign up clients. According to testimony given by Russ Squires, an officer of an "investor" in LPG who was familiar with its operation, LPG clients typically agreed to make payments over 27-29 months. LPG paid the "Marketing Affiliates" a percentage of these payments, before its services were fully performed.

19. LPG raised capital through "investors." In some cases the "investors" purchased at a discount accounts receivable owed by consumers to LPG. Some receivables were directly assigned to "investors." In other cases, LPG pays a portion of the fees owed by the consumer to "Marketing Affiliates" in exchange for the Marketing Affiliates' services in lead generation – identifying and obtaining consumers to which LPG sells its services.

20. There were more than 50 "Marketing Affiliates."

21. The "investors" invested over $60 million in LPG.

22. In a typical transaction LPG pays the "Marketing Affiliate" between 50% and

69% of the net amount less LPG's processing fees. One or more investors bought the future revenue stream of the 31% to 50% that would have otherwise stayed with LPG on what were promised as high-quality accounts, i.e. accounts with some prior history of payment.

23.     In 2021, LPG solicited Plaintiff for a program "wherein it would assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein."

24.     Under this program:

   a.     LPG would allegedly negotiate settlements of Plaintiff's delinquent debts;

   b.     Plaintiff would make monthly payments.

25.     LPG specifically told Plaintiff that its program would repair her credit and improve her credit score.

26.     Plaintiff electronically signed the following standard form documents:

   a.     A legal services agreement similar to Exhibit A (which is not Plaintiff's agreement);

   b.     Two addenda to legal services agreement (Exhibits B-C);

   c.     Electronic payment authorizations, in the form represented by Exhibit D;

   d.     Authorizations to debit bank account, in the form represented by Exhibits E-F;

27.     Each of the documents in Exhibits A-F is a standard form that was regularly used by LPG.

28.     Plaintiff  was induced to enter into the agreement by a document on LPG's web site, "Smarter Path to Debt Relief Services" (Exhibit G).  This document suggested that LPG could provide useful services to a consumer if the consumer answered the following questions in the affirmative:

   a.     "Has your credit score already been negatively impacted?"

   b.     "My credit report was damaged and needs to be worked on by a

knowledgeable lawyer."

29.     A consumer reading the material would understand from it that LPG could improve one's credit score and repair credit damage.

30.     In addition, the services offered by LPG, of settling debts for less than the amounts due, would necessarily result in credit repair, in that delinquent debts would be reported as settled, and the consumer's credit utilization (amount of credit used compared to amount of credit available, a key measure of creditworthiness) would be reduced.

31.     LPG also provided its clients a brochure entitled "Your Lawyers for Debt Resolution to Regain Financial Freedom" (Exhibit H).  The services listed include, "My credit report was damaged and needs to be worked on by a knowledgeable lawyer."

32.     LPG's methodology was as follows:

    a.     LPG routinely sent clients' creditors a form letter disputing their debts (Exhibit I).  The grounds of the dispute asserted in Exhibit I are legally questionable or baseless.

    b.     LPG routinely sent clients' creditors a form letter demanding that they cease and desist from further communications to the client (Exhibit J).

    c.     A short time after sending these letters, LPG routinely sent the major credit bureaus form letters (Exhibits K-M) disputing the client's debts and demanding "the immediate removal/ deletion of this account from my credit report . . . ."  This is sent by LPG but signed by the client with "poa" after the signature, meaning "power of attorney."

33.     All LPG files contain "Creditor Information" documents.  Most contain the letters described above.

34.     The effect of the removal of the accounts, if the demands were complied with, would be to improve the consumer's credit score.

## TRANSFER OF LPG CLIENTS TO PHOENIX LAW PC

35.     In February and March 2023, LPG faced financial distress as a result of disputes with its "investors" and litigation by consumers.

36.     LPG filed bankruptcy on March 20, 2023.

37.     Plaintiff was not notified of LPG's bankruptcy.

38.     On information and belief, LPG did not inform any of its clients of the bankruptcy filing.

39.     In February and March 2023, LPG purported to transfer about 40,000 clients directly to Phoenix Law PC.

40.     Another 15,000 clients were first transferred to Oakstone Law Group PC and then within several months from Oakstone to Phoenix Law PC.

41.     Plaintiff was one of the accounts transferred from LPG to Oakstone to Phoenix Law PC.

42.     On May 8, 2023, Plaintiff Diane Scarnavack received an email with "Welcome to Phoenix Law!" in the subject line.  The text was as follows:

Dear Valued Client,

Congratulations and welcome to Phoenix Law PC! We are excited to have the opportunity to serve as your counsel through the process of resolving your debt. We understand that you have been represented by and have worked with Oakstone Law Group, and that you are now at the tail end of your journey to becoming debt free. As we transition your file from Oakstone to Phoenix Law, our attorneys will review your current status and determine the best strategies to employ to complete your representation. We also understand that you may have worked with Litigation Practice Group in the past, and we want to assure you that we will be your legal representation until we reach resolution of each of your accounts. Our team will be in touch with you soon to discuss the process of transitioning your file and to provide an account status update. In the meantime, if you have any questions or concerns, please don't hesitate to contact us at 424-622-4044 or email us at service@phoenixlaw.co. Once again, welcome to Phoenix Law PC, we look forward to working with you.

Regards,
Ty Carrs [sic]
Managing Attorney, Phoenix Law

43.     As indicated in the email, Phoenix Law PC intended to continue the credit repair

methodology of LPG.

44.  The website of Phoenix Law PC lists Carss as the firm's only attorney, handling its 55,000 clients.

45.  LPG and Phoenix Law PC agreed that LPG was to receive 20% of the funds Phoenix Law PC received from the clients transferred to Phoenix Law PC.

46.  Plaintiff never agreed to be represented by Phoenix Law PC.

47.  Prior to receiving the May 8, 2023 email, Plaintiff believed she was still represented by LPG, because LPG's website was (and still is) active, https://lpglaw.com/, and Plaintiff was never notified of LPG's bankruptcy.

48.  For approximately one to two months, between March and May, Plaintiff was not able to access her LPG client portal, and could not reach anyone by phone to find out what was going on with her case.

49.  In April 2023, Plaintiff's account was debited without her authorization by Touzi Capital LLC.

50.  On information and belief, Touzi Capital LLC and Phoenix Law entered into a payment processing service agreement in which Touzi agreed to debit accounts of Phoenix Law "clients," and did so in Plaintiff's case.

51.  Plaintiff never authorized Phoenix Law PC or Touzi Capital LLC in writing or otherwise to debit her account on a periodic basis.

52.  Phoenix Law PC, via Touzi Capital LLC, nevertheless began debiting Plaintiff's bank account to obtain payment for its services.

53.  On information and belief, Defendant Touzi Capital, which is managed and operated by Defendant Eng Taing, is one of the three large investors in Validation Partners, and Validation Partners arranged financing for the growth of LPG's practices.

54.  On information and belief, Defendant Eng Taing previously served as the primary go between, representing investor groups in their direct negotiations with disbarred Diab / LPG,

7

and continues to serve as the primary go between, representing investor groups in their direct

negotiations with Phoenix Law and other law firms LPG has referred and transferred clients to.

## COUNT I -- CREDIT REPAIR ORGANIZATIONS ACT

55.     Plaintiff incorporates paragraphs 1-54.

56.     The CROA was enacted "(1) to ensure that prospective buyers of the services of

credit repair organizations are provided with the information necessary to make an informed

decision regarding the purchase of such services; and (2) to protect the public from unfair or

deceptive advertising and business practices by credit repair organizations."  15 U.S.C. §1679(b).

57.      Defendant Phoenix Law PC is a "credit repair organization" as defined by 15 U.S.C.

§1679a(3), in that it is a "person who uses any instrumentality of interstate commerce or the mails to

sell, provide, or perform any service, in return for the payment of money or other valuable

consideration, for the express or implied purpose of –  (i) improving a consumer's credit, credit

history, or credit rating, or (ii) providing advice or assistance to any consumer with regard to any

activity or service described in clause (i)."

58.     Defendant Carss personally authorized the use of the mails to continue providing

the same services previously provided by LPG to consumers, which services consisted of improving

a consumer's credit, credit history, and credit rating, and providing advice and assistance to

consumers with respect to improving their credit, credit history and credit rating.

59.     Defendant Carss also personally authorized the use of the mails to send creditors and

credit bureaus documents for the purpose of improving consumers' credit, credit history and credit

rating.

### Payment Before Services Fully Performed

60.     15 U.S.C. §1679b(b ) provides that "[n]o credit repair organization may charge or

receive any money or other valuable consideration for the performance of any service which the

credit repair organization has agreed to perform for any consumer before such service is fully

performed."

61. This prohibition was included in the CROA because of repetitive instances in which credit repair organizations obtained payments toward credit repair services, the consumers discontinued such services (often when the creditors with whom debts were to be negotiated filed lawsuits), and the credit repair organizations obtained money in excess of any benefit to the consumer. The practice was considered inherently unfair and deceptive.

62. Fully performed means just that – the services must be completed prior to payment. Billing consumers on a regular basis before the complete performance of services is a violation. *FTC v. Gill,* 265 F.3d 944, 949-50 (9th Cir. 2001).

63. Defendant Phoenix Law PC violated §1679b(b) by charging and receiving money for services it agreed to perform before such services were fully performed.

64. It is the standard policy and practice of Defendant Phoenix Law PC to charge a monthly sum before services are performed.

65. Defendant Phoenix Law PC violated §1679b(b) by debiting consumer accounts before its services were fully performed. The Legal Services Agreement, originally with LPG, provides for payments over a period of months, beginning the month after execution, and months before the form letters demanding removal of "tradelines" were sent out.

66. As part of the Legal Services Agreement, clients signed an Electronic Payment Authorization and a Preauthorized Checking and ACH Authorization form. These documents allowed LPG to pay itself monthly, starting before its key services were performed. Phoenix Law PC claimed to be entitled to debit accounts using the LPG forms.

67. Defendant Carss personally authorized such charges.

68. The charges were made by Defendant Touzi Capital.

69. Defendant Eng authorized and directed Touzi Capital to make such charges.

70. Defendants Touzi Capital and Eng were aware of the nature of Phoenix Law PC's business when they authorized and made such charges.

71. Defendant Phoenix Law PC's practice of charging a monthly sum before services are

performed is inherently in violation of the CROA.

## Failure to Make Disclosures

72.     The CROA provides that a credit repair organization must provide consumers with certain written disclosures in its contracts.

73.     These disclosures are intended to provide consumers with information they need to avoid unnecessary use of expensive credit repair organizations.

74.     15 U.S.C. §1679c(a) requires provision of a written statement informing the consumer of their rights under the Fair Credit Reporting Act and the CROA.

75.     15 U.S.C. §1679c(b) provides that "the written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

76.     The text of the required disclosure is as follows:

"Consumer Credit File Rights Under State and Federal Law

"You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

"You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

"You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

"You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

"Credit bureaus are required to follow reasonable procedures to ensure that the information

they report is accurate. However, mistakes may occur.

"You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

"If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

"The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:

"The Public Reference Branch
"Federal Trade Commission
"Washington, D.C. 20580".

15 U.S.C. §1679c(a).

77.     Thus, one paragraph of the required disclosure is a notice that "You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it."

78.     The only disclosure by LPG of cancellation rights is the statement in the last two sentences of the six sentences on the fourth page of its Legal Services Agreement.

79.     LPG violated 15 U.S.C. §§ 1679c(a)-(b) through its failure to provide the written disclosures required.

80.     LPG never provided such disclosures, nor did it provide a separate document containing such disclosures.

81.     On information and belief, was the standard policy and practice of LPG to not provide the required disclosures.

82.     By acquiring the contracts affected by the lack of written disclosures from LPG, and taking money pursuant to such contracts, Phoenix Law PC took advantage of the lack of disclosures.

83.     On information and belief, Defendant Carss personally authorized such practice.

11

**Failure to Provide Cancellation Rights**

84.     The CROA, pursuant to 15 U.S.C. §1679d(4), requires credit repair organization to include, in the contract between them and a consumer, "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'"

85.     Under 15 U.S.C. §1679e, a credit repair organization must provide a consumer a separate notice of a consumer's cancellation right.

86.     The only disclosure of cancellation rights is a statement in the last two sentences of the six sentences on the fourth page of Exhibit A that "You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email or fax, and shall not be responsible for any payments due after the date of cancellation.  A payment due within three days of the date of written cancellation shall be processed and shall not be refunded."

87.     The statement is not that required by the CROA, and is not bold or conspicuous. There is no separate notice of right to cancel.

88.     It was the standard practice of LPG to present cancellation rights in the manner described above.

89.     Defendant Phoenix Law PC received money from consumers pursuant to contracts induced though the failure to properly disclose cancellation rights.

90.     On information and belief, Defendant Carss authorized such receipt.

91.     The CROA requires a notice of cancellation rights because consumers would often contract for expensive and unnecessary credit repair services that they would, upon reflection, decide were expensive and unnecessary, only to find themselves contractually obligated.

92.     The CROA further dictates that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any

other person." 15 U.S.C. §1679f(c).

93.    The contracts of Plaintiff and the members of the class described below are void.

94.    The CROA provides for damages in 15 U.S.C. §1679g:

(a)    Liability established

Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

  (1)    Actual damages

    The greater of—

      (A)    the amount of any actual damage sustained by such person as a result of such failure; or

      (B)    any amount paid by the person to the credit repair organization.

  (2)    Punitive damages

      (A)    Individual actions

        In the case of any action by an individual, such additional amount as the court may allow.

      (B)    Class actions

        In the case of a class action, the sum of—

          (i)    the aggregate of the amount which the court may allow for each named plaintiff; and

          (ii)    the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

  (3)    Attorneys' fees

    In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

(b)    Factors to be considered in awarding punitive damages

In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors—

  (1)    the frequency and persistence of noncompliance by the credit repair

13

organization;

(2)     the nature of the noncompliance;

(3)     the extent to which such noncompliance was intentional; and

(4)     in the case of any class action, the number of consumers adversely affected.

## CLASS ALLEGATIONS

95.     Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

96.     The class consists of all persons who entered into contracts with LPG and whose accounts were transferred, directly or indirectly, to Phoenix Law PC.

97.     Residents of Georgia are excluded from the classes.

98.     Plaintiff may alter the class definition to conform to developments in the case and discovery.

99.     On information and belief, there are more than 100 members of each class, and each class is so numerous that joinder of all members is not practicable.

100.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members.  The predominant common questions are:

a.     Whether LPG engaged in the practices described;

b.     Whether Phoenix Law PC received the benefit of such practices when it acquired clients signed up by LPG;

c.     Whether Phoenix Law PC itself continued the practices of LPG;

d.     Whether such practices violates the CROA;

e.     The liability of each Defendant herein for such practices.

101.     Plaintiff's claim is typical of the claims of the class members.  All are based on the same factual and legal theories.

102.    Plaintiff will fairly and adequately represent the class members.  Plaintiff has retained

counsel experienced in class actions and consumer litigation.

103.    A class action is superior for the fair and efficient adjudication of this matter, in that:

a.    Individual actions are not economically feasible.

b.    Members of the class are likely to be unaware of their rights;

c.    Congress intended class actions to be the principal enforcement mechanism

under the CROA.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class

members and against Defendants herein for:

i.    A declaration that the practices complained of herein are unlawful

and violate the CROA;

ii.    A declaration that the contracts of Plaintiff and the class members

are void;

iii.    Actual damages  as provided under 15 U.S.C. §1679g(a)(l);

iv.    Punitive damages, as provided under 15 U.S.C. §1679g(a)(2)(A);

v.    Litigation expenses, reasonable attorney fees and costs as provided

under 15 U.S.C. §1679g(a)(3); and

vi.    Such other or further relief as the Court deems appropriate.


*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman (ARDC 0712094)
Tara L. Goodwin (ARDC 62970473)
Carly M. Roman (ARDC 6334371)
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service:  courtecl@edcombs.com

15

pro hac vice admission to be applied for:

Jason Graeber
250 Beauvoir Road, Suite 4C
Biloxi, MS 39501
(228) 207-7117
jason@jasongraeberlaw.com

## JURY DEMAND

Plaintiff demands trial by jury.


_/s/ Daniel A. Edelman_
Daniel A. Edelman

## NOTICE OF LIEN AND ASSIGNMENT

Please be advised that we claim a lien upon any recovery herein for 1/3 or such amount as a court awards. All rights relating to attorney's fees have been assigned to counsel.


*/s/ Daniel A. Edelman*
Daniel A. Edelman


Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
      & GOODWIN, LLC
20 S. Clark Street, Suite 1500
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.


*/s/ Daniel A. Edelman*
Daniel A. Edelman